NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation, <br><br>                Plaintiff, <br><br>    v. <br><br> DURGA, LLC, a Michigan Limited Liability Company; and SASIKALA VEMULAPALLI, An individual, <br><br>                Defendants. | Civil Action No.: 15-8412 (CCC) <br><br><br><br><br> **OPINION** |

**CECCHI, District Judge.**

## I.    <u>INTRODUCTION</u>

This matter comes before the Court by way of Plaintiff Travelodge Hotels, Inc.'s ("Plaintiff") complaint (ECF No. 1) against Defendants Durga, LLC ("Durga") and Sasikala Vemulapalli (together, "Defendants"). Plaintiff seeks, among other things, damages arising out of Defendants' alleged breach of a franchise agreement and guaranty executed by the parties. *See generally* ECF No. 1. Defendants filed an answer challenging Plaintiff's assertions, alleging they were fraudulently induced into entering the franchise agreement and guaranty, and are excused from performance given Plaintiff's own alleged material breaches. *See generally* ECF No. 11.

The Court held a two-day bench trial in this matter on February 1 and 2, 2024. ECF Nos. 154-55. The parties briefed the relevant issues before trial and provided initial proposed findings (ECF No. 145-46, 150), then submitted post-trial briefing and proposed findings of fact and conclusions of law. ECF Nos. 158-1 ("Pl. Br."), 158-2 ("PFOF"), 159-1 ("DFOF"), 159-2 ("Def.

Br."), 160.  Thereafter, the parties filed responsive briefs to each other's post-trial submissions. *See* ECF Nos. 161 ("Pl. Reply"), 162 ("Def. Reply").

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  The Court derives its conclusions of fact from the evidence admitted and witness testimony provided at trial, along with those facts stipulated to in the Final Pretrial Order (ECF No. 138, hereinafter, "FPTO"); *see also NXIVM Corp. v. Sutton*, No. 06-cv-1051, 2019 WL 4010859, at *2 (D.N.J. Aug. 26, 2019) (deriving Rule 52(a) conclusions of fact, in part, from the parties stipulated facts in the final pretrial order).  The Court had the opportunity to evaluate the evidence and the credibility of all the witnesses, observe their demeanor as they testified, and consider the extent to which their testimony has been supported or contradicted by other credible evidence.  The Court finds Plaintiff's witnesses, Kendra Mallet and Robert Spence, to be credible.  On the other hand, the Court finds Defendants' witnesses, Sid Syed and Vijayakumar Vemulapalli ("Kumar"),[1] lacked credibility.  These findings are based upon the level of detail and consistency of the witnesses' testimony regarding the events and the witnesses' demeanor while testifying.

While the Court has reviewed the entirety of the record, the Court includes references only to the evidence most pertinent to its analysis.  For the reasons set forth below, the Court will enter judgment in Plaintiff's favor.

---

[1] At trial, Mr. Vemulapalli testified that he is commonly referred to as Kumar.  ECF No. 155 at 280:6-8.

## II.    CONCLUSIONS OF FACT[2]

### a.  The Parties

This action arises out of a set of agreements entered into by Plaintiff and Defendants concerning the operation of a 129-room guest lodging facility located at 11171 Dowlin Drive, Sharonville, Ohio 45241 (hereinafter, the "Facility").  FPTO at 2-3.  Plaintiff, a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Parsippany, New Jersey, is one of the nation's largest guest lodging facility franchisors.  *Id.* at 2.  Plaintiff does not own or operate any hotels but, instead, operates a guest lodging facility franchise system comprised of federally registered trade names, service marks, and logos.  *Id.* Defendant Durga is a limited liability company organized and existing under the laws of the State of Michigan, with a principal place of business in Cincinnati, Ohio.  *Id.*  Defendant Vemulapalli is Durga's sole member and is a citizen of Cincinnati, Ohio.  *Id.*

### b.  Execution of the Franchise Agreement and Guaranty

The parties' relationship formed in early 2013 when Kumar, Durga's authorized agent and Defendant Vemulapalli's husband, began expressing interest in purchasing the Facility.  DFOF at 4; ECF Nos. 154-55 (Trial Transcript, "Trial Tr.") at 289:14-25, 290:1-2.  Kumar began purchasing hotel properties sometime around 2011 and, by early 2013, had funds to invest following his sale of another hotel.  DFOF at 4; Trial Tr. at 284:21-23, 289:11-290:19.  Kumar's employee Albert Bashir introduced him to Sid Syed, a then-employee at the Facility, who in turn introduced Kumar

---

[2] To the extent the parties' briefing relied upon deposition testimony or other evidence not admitted at trial, the Court does not consider it here.  *See, e.g.*, *Banga v. Kanios*, No. 16-cv-04270, 2024 WL 1898423, at *2 n.4 (N.D. Cal. Apr. 30, 2024) (refusing to consider evidence not introduced at trial when considering relief under Rule 52(c)).

to the Facility's prior owner, Mohammad Jilani.  Trial Tr. at 289:14-25.  Kumar offered Mr. Jilani $800,000 for the Facility, an offer Mr. Jilani accepted.  Trial Tr. at 290:7-19.

It was at that time that Kumar began interacting with representatives from Plaintiff's parent company, Wyndham Hotel Group LLC ("Wyndham").  Trial Tr. at 290:21-23, 299:9-16.  At trial, Kumar testified to verbal conversations he purportedly had with Wyndham representatives, including an individual named Steve Kleinknecht.  Trial Tr. at 290:24-291:6.  Kumar asserts Mr. Kleinknecht promised that, if Durga signed a franchise agreement to operate the Facility as a Travelodge, Wyndham would thereafter give Durga a superior "flag" (*i.e.*, brand) to operate at the Facility, such as a Days Inn or Ramada.  Trial Tr. at 301:24-302:4.  Kumar was aware of the Facility's physical condition, of its poor reputation in the community, and that a crime had previously occurred on the property.  Trial Tr. at 242:3-10, 355:1-4, 356:7-12.  Kumar testified that, given this history, it was Mr. Kleinknecht's recommendation to change the Facility's brand in order for it to be profitable.  Trial Tr. at 302:19-24.  As a result of these conversations, Kumar testified to his understanding that receipt of a superior Wyndham flag was a guaranteed promise. Trial Tr. at 323:8-19; DFOF at 5.

Durga purchased and took possession of the Facility on October 23, 2013.  Trial Tr. at 102:15-18.  Plaintiff was a part of neither the sale nor negotiations for Durga's purchase of the Facility.  Trial Tr. at 95:16-21.  Around this time, in September 2013, Plaintiff provided Durga with a Franchise Disclosure Document ("FDD"), which "relates information about the Travelodge as well as the franchise agreements."  Trial Tr. at 96:10-15, 97:24-25; Trial Exhibit ("Tr. Ex.") 10; *see also* Tr. Ex. 11.  The FDD provided to Durga was specific to the Travelodge brand.  Trial Tr. at 96:16-24.  Durga was then provided with a "punch list" ("PIP"), which "describes what a site would have to do to be in compliance . . . with the Travelodge brand's standards."  Trial Tr. at

98:12-15; Tr. Ex. 7.  The PIP, identifying necessary physical improvements, was generated on October 21, 2013, following an inspection of the Facility.  Trial Tr. at 98:25-99:2, 167:5-8.

The parties then engaged in negotiations over terms of a franchise agreement.  Trial Tr. at 99:10-13, 114:2-5, 188:1-3.  On November 5, 2013, Plaintiff sent Durga a proposed franchise agreement for franchising of the Travelodge brand.  Tr. Ex. 12; Trial Tr. at 99:14-23.  A revised draft franchise agreement was sent to Durga via email on November 20, 2013.  Tr. Ex. 23.  In the same correspondence, Plaintiff sent Durga a letter agreement ("Flip Letter") acknowledging Durga's interest in other Wyndham brands and providing for a future opportunity to apply for conversion to a Days Inn franchise.  Tr. Ex. 3; Trial Tr. at 100:2-24.  Upon receipt, Durga signed the Flip Letter.  Tr. Ex. 3.  While the letter itself is dated November 20, 2013, its execution date is backdated to October 23, 2013.  *Id.*  Durga signed the PIP on November 25, 2013.  Tr. Ex. 7; Trial Tr. at 99:3-6.  Defendants executed the final franchise agreement ("Franchise Agreement") and a guaranty ("Guaranty") on November 27, 2013.  Tr. Ex. 1.  The Franchise Agreement's effective date was also backdated to October 23, 2013.  *Id.*  With Defendant Vemulapalli's authorization, Kumar signed the Franchise Agreement on behalf of Durga and the Guaranty on behalf of Defendant Vemulapalli.  FPTO at 3-4; Trial Tr. at 319:15-22

### c.  Terms of the Parties' Agreements

The Franchise Agreement authorized Durga to operate the Facility as a 129-room Travelodge hotel for a fifteen-year term.  FPTO at 2-3; Tr. Ex. 1 at § 5.  Various provisions of the Franchise Agreement required Durga to make periodic payments to Plaintiff for, among other things, royalties, system assessment fees, taxes, and interest (together, "Recurring Fees").  FPTO at 3; Tr. Ex. 1 at §§ 7, 18.4; *id.* at Schedule C; *see also* PFOF at 2-3 (detailing terms of the relevant fee provisions).  Durga was also required to assume all obligations, including financial obligations,

of the Facility's predecessor franchisee.  Tr. Ex. 1 at Schedule D; Trial Tr. at 191:13-192:6.  The Franchise Agreement also permitted interest at a rate of 1.5% per month on all past due amounts payable to Plaintiff under the agreement.  Tr. Ex. 1 at § 7.3.  Because many of the Recurring Fees were predicated on gross room revenue, Durga was required to maintain accurate financial information and submit monthly revenue reports to Plaintiff.  Tr. Ex. 1 at § 3.6.  In turn, among other things, Plaintiff was required to provide Durga with access to its reservation system, which Durga was required to use, along with needed software maintenance and support.  Tr. Ex. 1 at § 4.2; *see also* Tr. Ex. 8.  Plaintiff was permitted to restrict Durga's access to the reservation system in the event of a default under the Franchise Agreement or failure to pay required fees.  Tr. Ex. 1 at § 11.4.

Section 11.2 of the Franchise Agreement permitted Plaintiff to terminate the agreement if Durga (i) discontinued operation of the Facility as a Travelodge, or (ii) lost possession or right to possession of the Facility.  Tr. Ex. 1 at § 11.2.  In the event of a termination, Durga was required to pay Plaintiff liquidated damages.  Tr. Ex. 1 at § 121.  Depending on the circumstances of the termination, Durga would have to pay up to $1,000 per guest room that it was authorized to operate.  Tr. Ex. 1 at § 18.1.  The Franchise Agreement stipulated that liquidated damages were "in place of [Plaintiff's] claims for lost future Recurring Fees."  Tr. Ex. 1 at § 12.1.  And in the event of litigation to enforce the Franchise Agreement, the non-prevailing party was required pay for the prevailing party's attorneys fees and costs.  Tr. Ex. 1 at § 17.4.

The Franchise Agreement stated that the written agreement "together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties."  Tr. Ex. 1 at § 17.7.3.  Durga acknowledged "that no salesperson has made any promise or provided any information [ ] about

projected sales, revenues, income, profits or expenses from the Facility," and "that the franchise relationship is an arms' length, commercial business relationship." Tr. Ex. 1 at §§ 17.7.4, 17.7.5.

In order to induce Plaintiff into entering the Franchise Agreement, the corresponding Guaranty required Defendant Vemulapalli to "make each payment and perform or cause [Durga] to perform, each unpaid or unperformed obligation of [Durga] under the [Franchise] Agreement" in the event of default.  FPTO at 4; Tr. Ex. 2.  The parties stipulated that the Guaranty also requires Defendant Vemulapalli "to pay the costs, including reasonable attorneys' fees, incurred by [Plaintiff] in enforcing its rights or remedies under the Guaranty or the Franchise Agreement." FPTO at 4.

The Flip Letter dictated that Wyndham "is willing to have the Franchisors [Travelodge and Days Inn] consider the one time future conversion of the Facility from a Travelodge facility to a lodging facility franchised by [Days Inn], upon" the satisfaction of certain conditions.  Tr. Ex. 3. These conditions included, among other requirements, Durga not being in default under the Franchise Agreement.  *Id.*  Further, the Flip Letter required Durga to apply for conversion within the first year of executing the Franchise Agreement.  *Id.*  The Flip Letter articulated that "[t]he right to apply for another Franchisor's System is not an agreement and shall in no way imply that [Durga] shall be granted another Franchisor's franchise, or [that] the terms and conditions of [Durga's Franchise] Agreement will be duplicated in [a] new agreement."  *Id.*

### d.  The Parties' Performance and Termination

Following execution of the Franchise Agreement, the parties dispute the time period in which Durga was given access to Plaintiff's reservation system.  While Plaintiff contends the system was made available immediately after signing the Franchise Agreement, Defendants argue that Durga first accessed the reservation system in January 2014.  As discussed *infra*, the balance

of evidence presented at trial establishes that Durga had access to the reservation system upon execution of the Franchise Agreement on November 27, 2013, and was listed on third-party channels no later than December 6, 2013. *See, e.g.*, Trial Tr. at 107:3-6 (Ms. Mallet testifying, "[w]e were aware [Durga] made reservations through the system as soon as the franchise agreement was executed"); Tr. Ex. 9 at THI000264 (noting that Durga was live on all of Plaintiff's channels as of December 6, 2013); Trial Tr. at 276:24-277:2 (Mr. Syed testifying that Durga made reservations through Plaintiff's system in November and December 2013). Further, at trial, through testimony and emails, Defendants asserted that Plaintiff failed to provide necessary technical support for its software systems, which Defendants contend often did not function. *See* Trial Tr. at 250:14-20 (Mr. Syed testifying that the reservation system would "shut down" from "time to time" or "quite a bit"); Tr. Ex. 22 at Durga000018 (May 9, 2014, email from Mr. Syed stating, "[m]y online reporting is not working since long time and no one is fixing it"). However, Plaintiff introduced records documenting frequent communication between Durga and Plaintiff's technical support staff. *See* Tr. Ex. 9.

The parties also dispute the extent to which Durga was reporting revenues and paying Recurring Fees during the Franchise Agreement's active term. At trial, Plaintiff introduced an itemized account statement (Tr. Ex. 5) and corresponding cash application report (Tr. Ex. 6) detailing Durga's outstanding fee balance and prior payments. The cash application report reflects $16,000 in initial fees associated with execution of the Franchise Agreement and a set of payments from May 20, 2014, totaling $4,265. Tr. Ex. 6; *see also* Trial Tr. at 194:10-195:4. Thus, Plaintiff asserts that Durga's first and only payment towards Recurring Fees was made at that time. Trial Tr. at 195:9-10. The itemized account statement, dated as of February 1, 2024, reflects over $35,000, pre-interest, in unpaid Recurring Fees. Tr. Ex. 5. Defendants' witnesses testified

generally that they recalled mailing multiple checks to Plaintiff.  Trial Tr. at 241:1-3 ("Q. And when Durga ran it and Kumar ran it you mailed checks in to Wyndham?  [Mr. Syed:] A. Yeah."), 328:18-20 (Kumar testifying that "Albert takes the checks, I sign it, and he takes it to Sid [Syed] [ ] to be mailed to Travelodge").

 At no point during Durga's operation of the Travelodge did Defendants submit an application to convert the Facility to another brand.  Trial Tr. at 101:10-11.  Nor had Durga ever completed the improvements required in the PIP for the Facility to comply with Travelodge's standards.  Trial Tr. at 356:18-357:15.  Yet, Kumar testified that he purportedly learned sometime in Spring 2014 that Durga would not be converted to a Days Inn because there was already another Days Inn operating within a three-mile radius of Durga's hotel.  Trial Tr. at 328:23-329:4, 330:8-8-16.  He also asserted that conversion to a Ramada was discussed, which would have required Durga to construct an on-site restaurant, but that discussion purportedly fell through.  Trial Tr. at 330:19-331:11.  Thereafter, Kumar testified that he consulted a lawyer who instructed Durga to cancel the Franchise Agreement.  Trial Tr. at 331:12-16.  Durga sent Plaintiff a letter dated September 30, 2014 (the "Switch Letter"), advising that Defendants ceased operation of the Facility as a Travelodge and had contracted to operate the Facility as a competitor brand, Magnuson Hotel.  Tr. Ex. 20; Trial Tr. at 332:8-17.

 In response, Plaintiff sent Durga a letter dated November 4, 2014, acknowledging Durga's unilateral termination of the Franchise Agreement, effective September 30, 2014, and advising that Durga was required to pay $129,000 in liquidated damages and the outstanding balance of unpaid Recurring Fees.  Trial Ex. 4; Trial Tr. at 184:15-185:2.  Following termination of the Franchise Agreement, Plaintiff was required to have its signage removed from the Facility because Durga failed to "de-identify" the Facility.  *See* Trial Tr. at 112:25-113:14, 115:19-116:6 (Kendra

Mallet testifying that Section 13.2 of the Franchise Agreement required Durga to de-identify the property following termination); Tr. Ex. 1 at § 13.2; Tr. Ex. 18 (March 2016 contractor invoice corroborating the cost of signage removal from the Facility).

### e. Procedural History

Plaintiff filed the instant complaint against Defendants on December 3, 2015 (ECF No. 1), seeking (i) an accounting of all revenue generated at the Facility; (ii) liquidated damages resulting from Durga's breach of the Franchise Agreement; (iii) in the alternative, actual damages; (iv) the outstanding balance of unpaid Recurring Fees; and (v) judgment against Defendant Vemulapalli for the total sum of damages given her obligations under the Guaranty. Defendants filed an answer on April 8, 2016. ECF No. 11. Following discovery, the Court denied Plaintiff's motion for summary judgment in an Opinion and Order dated January 1, 2023. ECF Nos. 115-16. The Final Pretrial Order was entered on August 11, 2023. ECF No. 138. Subsequently, the parties filed pretrial briefing and initial proposed findings. ECF No. 145-46, 150.

The Court presided over a two-day bench trial on February 1 and 2, 2024. ECF Nos. 154-55. In addition to the documentary evidence admitted at trial, the Court also heard testimony from Kendra Mallet, a senior director in Plaintiff's domestic contracts administration department, and Robert Spence, a senior director of financial services employed by Plaintiff. Trial Tr. at 87:25-88:7 (Ms. Mallet testifying that she "oversee[s] the contracting and application process for contracts that have been submitted for independent hotel owners and operators to become one of [Plaintiff's] brands"), 183:5-12 (Mr. Spence testifying that he "oversee[s] the collections department to see that [Plaintiff's] franchisees are meeting their financial obligations as outlined in their franchise agreements"). For Defendants, the Court heard testimony from Sid Syed, an

employee at the Facility while it operated as a Travelodge, and Kumar, the authorized agent for Durga and Defendant Vemulapalli.  Trial Tr. at 236:24-237:1.

Following trial, as stated above, the parties submitted post-trial briefing along with proposed findings of fact and conclusions of law (ECF Nos. 158-60), and respective reply briefing (ECF Nos. 161-62).

### III.    JURISDICTION

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the opposing parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  *See* FPTO at 1.  Plaintiff is a corporation organized in Delaware, with a principal place of business in New Jersey.  *Id.* at 2.  Durga is a limited liability company organized in Michigan, with a principal place of business in Ohio.  *Id.*  Defendant Vemulapalli is Durga's sole member and is a citizen of Cincinnati, Ohio.  *Id.*  Central to the parties' dispute is whether Defendants owe Plaintiff, among other costs, $129,000 in liquidated damages following the alleged breach of the Franchise Agreement.  *Id.* at 4.  The parties do not contest the Court's jurisdiction.  *See id.* at 1-4.

### IV.    LEGAL STANDARD

After conducting a nonjury trial, the Court may enter judgment on a claim or defense after a party has been fully heard on the issue.  Fed. R. Civ. P. 52(c); *see also Newborn Bros. Co. v. Albion Eng'g Co.*, No. 12-cv-2999, 2023 WL 3645716, at *2 (D.N.J. May 24, 2023).  "In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of the trial." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010).  In so doing, the Court does not "view the evidence through a particular lens or draw inferences favorable to either party." *Id.*  "The district

court should also make determinations of witness credibility where appropriate." *Id.* Ultimately, to enter judgment pursuant to Rule 52(c), the Court must make findings of fact and conclusions of law pursuant to Rule 52(a). *Id.* at 273.

## V.    CONCLUSIONS OF LAW

Plaintiff moves for a judgment entitling it to damages resulting from Defendants' alleged violation of the Franchise Agreement and Guaranty. Specifically, Plaintiff argues that the terms of its agreements with Defendants entitle it to recover unpaid Recurring Fees, liquidated damages, and attorneys fees and costs of litigation. Defendants argue that they should not be held liable for terminating the Franchise Agreement because they were fraudulently induced into executing the contract by one of Plaintiff's representatives, and are otherwise excused from performance due to Plaintiff's alleged material breach. For the same reasons, Defendants argue that there was also no breach of the Guaranty.

### a.  Liability Under the Franchise Agreement

At the outset, there is no substantive dispute that Durga terminated the Franchise Agreement when it prematurely ceased operation of the Facility as a Travelodge hotel. Under New Jersey law,[3] breach of contract requires proof of "[(i)] a valid contract between the parties, [(ii)] the opposing party's failure to perform a defined obligation under the contract, and [(iii)] the breach caus[ing] the claimant to sustain[ ] damages." *Par Pharm., Inc. v. Ouva Pharma, Inc.*, No. 17-cv-6115, 2019 WL 356549, at *10 (D.N.J. Jan. 28, 2019) (quoting *EnviroFinance Grp., LLC v. Env't Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. App. Div. 2015)).

---

[3] Neither party disputes that the Franchise Agreement is governed by New Jersey law. *See* Tr. Ex. 1 at § 17.6.1 ("This Agreement will be governed by and construed under the laws of the State of New Jersey.").

Here, the parties agree that Durga entered into the Franchise Agreement with Plaintiff no later than November 2013. FPTO at 2; Trial Tr. at 102:15-21 (Kendra Mallet testifying that "[t]he franchise agreement wasn't finalized until November 27, 2023"). Defendants do not challenge the agreement's validity on its face. There is also no dispute that the Franchise Agreement required Durga to operate the Facility as a Travelodge for a fifteen-year term. FPTO at 3; Trial Tr. at 102:22-23; Tr. Ex. 1 at § 5. Indeed, Defendants admit that Durga terminated the Franchise Agreement and ceased its operation of the Facility as a Travelodge less than one year after signing the Franchise Agreement. FPTO at 4; *see also* Trial Tr. at 111:5-11. The parties also do not contest that the terms of the Franchise Agreement entitled Plaintiff to liquidated damages upon Durga's breach. FPTO at 3-4; *see also* Tr. Ex. 1 at §§ 12, 18.1.

Thus, there is no argument that Durga did not terminate the Franchise Agreement. Instead, Defendants argue that Durga's termination does not constitute a breach of contract because (i) Plaintiff offered false assurances to fraudulently induced Durga into executing the Franchise Agreement, and (ii) Plaintiff first breached the Franchise Agreement by failing to timely provide Durga with the appropriate reservation software. Def. Br. at 8; *Twin Crest Grp. v. Delaware Valley Urology, LLC*, No. 10-cv-6350, 2013 WL 6508242, at *8 (D.N.J. Dec. 12, 2013) ("A 'breach of contract and termination are two very different concepts.'" (internal citation omitted)).

### i. Fraudulent Inducement

Under New Jersey law, a fraudulent inducement claim requires showing "(1) a material misrepresentation of fact; (2) knowledge or belief by the [adverse party] of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (citing *Gennari v. Weichert*

*Co. Realtors*, 691 A.2d 350, 367-68 (N.J. 1997)); *see also CDK Glob., LLC v. Tulley Auto Grp., Inc.*, 489 F. Supp. 3d 282, 303-04 (D.N.J. 2020) (stating same).

Defendants argue that Plaintiff fraudulently induced Kumar, on behalf of Durga, to execute the Franchise Agreement by making oral promises that the Facility would be converted to a Days Inn or Ramada at some point in the future. Def. Br. at 9-10; DFOF at 5. Defendants contend that Plaintiff's alleged false assurances are evidenced by, among other things, Kumar's testimony at trial. Def. Br. at 9-10. Defendants assert that Durga only purchased the Facility, executed the Franchise Agreement, and made certain capital improvements to the Facility in reliance on Plaintiff's alleged assurances. *Id.* at 10. Plaintiff responds that no fraudulent inducement occurred because (i) even accepting Defendants' allegations, fraud cannot be predicated on a speculative promise of future performance; (ii) Defendants cannot prove Plaintiff's knowledge of the alleged promise's falsity; (iii) Defendants cannot establish Durga's reasonable reliance upon the alleged assurances; and (iv) any fraudulent inducement defense is barred by the economic loss doctrine. Pl. Br. at 8-15.

### 1. Material Misrepresentation of Fact

Initially, the Court finds Defendants have failed to establish that any material misrepresentation of fact was made to Kumar regarding the promise of a more desirable Wyndham flag. *CDK Glob., LLC*, 489 F. Supp. at 303-04 ("The material misrepresentation must be shown by 'clear and convincing evidence.'" (internal citation omitted)); *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 277 (3d Cir. 2010) (finding district court did not err in denying fraudulent inducement claim on a Rule 52(c) judgment where "State Steel had failed to prove a material misrepresentation by clear and convincing evidence"). In their post-trial briefing, Defendants concede that, "[w]ithout the firsthand testimony of Kleinknecht all that is left is the Defendants'

testimony" as to Mr. Kleinknecht's purported fraudulent assurances. Def. Reply at 6. Kumar testified at trial that if he purchased the Facility under the Travelodge flag, Mr. Kleinknecht assured him that "within three, four months, [Wyndham would] give [him] a new franchise agreement that would . . . get [him] off the Travelodge" brand. Trial Tr. at 295:19-23. When asked whether Defendants had any documentation corroborating this promise or Kumar's meetings with Mr. Kleinknecht, none was introduced. Trial Tr. at 300:3-15. Without more, and in light of the competing evidence discussed *infra*, the Court does not give considerable weight to this self-serving testimony recounting oral conversations dating back roughly ten years. *See, e.g.*, *DLJ Mortg. Cap., Inc. v. Sheridan*, 975 F.3d 358, 371 (3d Cir. 2020) (noting the Court's authority to "make credibility determinations" in considering judgment under Rule 52(c)). And while Defendants argue that "Plaintiff did not produce Mr. Kleinknecht at trial," Def. Reply at 6, it is Defendants' burden to establish the elements of their fraudulent inducement claim, *see, e.g.*, *Shah v. Shah*, No. 12-cv-4648, 2013 WL 12157867, at *4 (D.N.J. Oct. 28, 2013) ("Defendant admits that if fraudulent inducement is a valid defense, he has the burden of proving that Plaintiff committed fraud.").

Even if the Court were to accept Defendants' assertions, the alleged assurances of a new Wyndham flag would constitute no more than a promise of future performance. Under New Jersey law, fraudulent inducement requires showing a "material misrepresentation of a *presently existing or past fact*." *Green Star Energy Sols., LLC v. Newark Warehouse Urb. Renewal, LLC*, No. 21-cv-18267, 2023 WL 2424190, at *4 (D.N.J. Mar. 8, 2023) (quoting *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 158 (D.N.J. 2013)) (emphasis added). This constitutes "a fairly narrow category" of representations. *Id.* (quoting *Munenzon v. Peters Advs., LLC*, 553 F. Supp. 3d 187, 205 (D.N.J. 2021)). "Statements as to future or contingent events, to

expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Id.* (internal citation omitted); *see also Fimbel v. Fimbel Door Corp.*, No. 14-cv-1915, 2014 WL 6992004, at \*4 (D.N.J. Dec. 10, 2014) ("An alleged fraud cannot be predicated solely on a promise of future performance that, in the end, goes unfulfilled." (internal citation omitted)).

Here, Defendants' fraudulent inducement claim is wholly predicated on assurances that Mr. Kleinknecht purportedly made to Kumar sometime between May and July of 2013.[4] *See* Trial Tr. at 299:9-16; DFOF at 5 ("Steve Kleinknecht, guaranteed by oral promise that Defendants would be given the rights to convert the Travelodge into a Days Inn or a Ramada hotel."). These alleged assurances were made months prior to Durga's October 2013 purchase of the Facility and November 2013 execution of the Franchise Agreement. *See* Trial Tr. at 102:15-18, 319:15-24. Defendants also admit that Mr. Kleinknecht promised "Wyndham would give [Durga] a better brand like Days Inn . . . *if* Kumar fixed the hotel, and improve[d] the hotel with some capital investments." Def. Br. at 4 (emphasis added); *see also* Trial Tr. at 297:4-8 ("THE COURT: Is there any other reason why you bought the property? THE WITNESS: Yes. If I invest, the Wyndham people said, [y]ou put the money in, it will be worth a lot of money in the future."). Such contingent, forward-looking promises are not misrepresentations sufficient to support a claim for fraudulent inducement. *See, e.g.*, *Green Star Energy Sols., LLC*, 2023 WL 2424190, at \*4 (finding assurances "that Green Star *would* be paid timely in connection with [a certain project] . . . fail to support an actionable fraud claim because those statements speak to future, contingent

---

[4] Defendants also point to purported discussions between Kumar and Mr. Kleinknecht concerning an alleged "promise of a Ramada Flag for a [separate] location in Moraine, Ohio." DFOF at 5; Def. Br. at 6. The Court finds that these alleged conversations are neither directly relevant to Defendant's fraudulent inducement defense nor clearly established by the trial record.

events"); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J. 1998) (noting that "virtually all of the statements plaintiffs recount use words such as 'will,' 'plan' or 'expect' to indicate their future orientation. However, predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true").

### 2. Plaintiff's Knowledge of Falsity

A promise of future performance may sustain a fraudulent inducement claim only where the declarant has "no intention at the time he makes the statement of fulfilling the promise." *Fimbel*, 2014 WL 6992004, at *4 (internal citation omitted). Plaintiff contends that Defendants have failed to establish any evidence of Plaintiff's knowledge as to the falsity of Mr. Kleinknecht's alleged statements. Pl. Br. at 8. The Court agrees. Plaintiff first points to the November 20, 2013, Flip Letter provided to Durga that promises to "consider the one time future conversion of the Facility from a Travelodge" to a new Wyndham brand only if certain future conditions are met. Tr. Ex. 3 at 1. Indeed, the letter explicitly stated that "[t]he right to apply for another Franchisor's System is not an agreement and shall in no way imply that [Durga] shall be granted another Franchisor's franchise." *Id.* The Flip Letter, which Defendant Vemulapalli signed on behalf of Durga, (i) evidences Plaintiff's position that it did not knowingly make a false promise to Durga offering an improved Wyndham flag, but rather, offered Durga the opportunity to apply for one in the future; and (ii) explicitly rejects the presumption that the right to apply for a new flag constitutes a promise that it will be granted. *Id.* at 2; Trial Tr. at 100:16-101:13.

In contrast, Defendants argue that the Flip Letter and testimony from Ms. Mallet confirm Mr. Kleinknecht's knowledge as to the falsity of his assurances. Def. Reply at 4-9. At trial, Ms. Mallet testified that it was "common practice" to issue a flip letter, which only "gives the franchisee the opportunity in the future to apply to be a different brand." Trial Tr. at 100:2-15.

Therefore, Defendants argue, any prior promise by Mr. Kleinknecht that Durga would receive an improved flag without the need for an application must have been knowingly false. Def. Reply at 6-7 (arguing that Mr. Kleinknecht's promise "must have been a lie from the very beginning as he knew that this could never be guaranteed by Wyndham's own guidelines"). This argument is without merit for two reasons. First, as noted above, Defendants have failed to credibly establish that Mr. Kleinknecht actually made any such assertions. And second, even if they had, Defendants have offered no evidence to show that Mr. Kleinknecht was aware of this policy. In fact, in their briefing, Defendants admit that "[u]nfortunately, no one can know for sure whether Kleinknecht intended or even knew whether a flag could be issued" to Durga. Def. Reply at 6.

### 3. Defendants' Reasonable Reliance and Plaintiff's Intention

Even if Defendants offered sufficient evidence of a knowingly false promise made by Mr. Kleinknecht, under the circumstances, Durga could not have reasonably relied on that promise.

At the outset, the parol evidence rule bars Defendants' reliance on these alleged assurances. The Franchise Agreement signed by Durga contained a provision attesting that Plaintiff did not make "any oral or written representation or promise to [Durga] upon which [it is] relying to enter into this [Franchise] Agreement." Tr. Ex. 1 at § 17.7.2. On summary judgment, this Court found that Defendants could rely on parol evidence, notwithstanding this provision, insofar as Mr. Kleinknecht's purported assurances pertained to matters extraneous to Durga's agreement with Plaintiff. ECF No. 115 at 6-9; *see also Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 598 A.2d 1234, 1236 (N.J. App. Div. 1991) (recognizing "a distinction between fraud regarding matters expressly addressed in the integrated writing and fraud regarding matters wholly extraneous to the writing"). However, this exception to the parol evidence rule "is limited where an alleged oral understanding is expressly contradicted in a written agreement." *Travelodge Hotels, Inc. v. Honeysuckle*

18

*Enterprises, Inc.*, 244 F. App'x 522, 526 (3d Cir. 2007); *see also Filmlife, Inc.*, 598 A.2d at 1236 (noting the "general rule" that "a parol agreement which is in terms contradictory of the express words of a contemporaneous or subsequent written contract . . . necessarily is ineffectual" (internal citation omitted)).

At trial, the parties presented the Flip Letter, which was an agreement signed by both Durga and Plaintiff. Tr. Ex. 3. Durga signed the Flip Letter just days before its execution of the Franchise Agreement. Trial Tr. at 120:12-16; Pl. Br. at 13. The Flip Letter—in particular, its provision that "[t]he right to apply for another [flag] . . . shall in no way imply that [Durga] shall be granted another [flag]"—is a written term directly contradicting Mr. Kleinknecht's alleged promise guaranteeing a new Wyndham flag. Tr. Ex. 3 at 1; *see also Honeysuckle Enterprises, Inc.*, 244 F. App'x at 526-27 (affirming finding that "Honeysuckle could not be deemed to have relied on [an oral] representation because the agreement[it signed contained multiple acknowledgments that no Travelodge representative had made representations about sales or profits"). Defendants also contend that Mr. Kleinknecht never mentioned an application when discussing the possibility of a new Wyndham flag.[5] Def. Br. at 4; DFOF at 7. Even if true, the Flip Letter explicitly requires an application process. Tr. Ex. 3. Notably, despite its execution of the Flip Letter, Durga never submitted an application to convert the Facility into a Days Inn or any other Wyndham brand. *See* Trial Tr. at 101:10-11. Accordingly, Defendants cannot rely on an oral promise that directly contradicts the terms of a written agreement Durga signed and failed to comply with.[6]

---

[5] However, at trial, Kumar was asked whether Mr. Kleinknecht had ever contacted Defendants about completing an application for a Days Inn flag. Trial Tr. at 331:17-332:7. Kumar first noted, "I don't fill out the application, somebody else does," and then responded, "I don't think so, but that's why I was trying to get Albert Bashir [ ] as one of the witness[es]" in this case. *Id.*

[6] It is also of no moment that Kumar testified he never read the Flip Letter or Franchise Agreement. Trial Tr. at 271:12-14; DFOF at 6. "A person who signs an agreement is presumed to have read it." *Travelodge Hotels, Inc v. Honeysuckle Enterprises, Inc.*, No. 02-2889, 2005 WL 3164205, at *8 (D.N.J. Nov. 10, 2005). Both agreements were executed by Durga and, in fact, certain terms of the Franchise Agreement were

Defendants next challenge the October 23, 2013, date handwritten on the Flip Letter as evidence of Plaintiff's intent. Def. Br. at 10-11. Specifically, Defendants contend that Plaintiff promised Durga a better Wyndham flag, thus enticing Durga to purchase the Facility in October 2013, and then issued the Flip Letter a month later. Def. Br. at 10. The Court is not persuaded. First, despite Defendants' assertions, the date upon which Durga purchased the Facility is immaterial. Defendants' affirmative defense contends that Durga was fraudulently induced into executing the *Franchise Agreement*, not its purchase of the Facility. It is undisputed that Plaintiff was not a party to the sale of the Facility or Durga's negotiations for that sale. Trial Tr. at 95:16-21. The parties also do not dispute that the Flip Letter was actually dated and provided to Defendants on November 20, 2013. Trial Tr. at 119:15-24. This date, and the date upon which Durga executed the Flip Letter, still precede Durga's November 27, 2013, execution of the Franchise Agreement.[7] Trial Tr. at 120:12-16; Pl. Br. at 13. Therefore, Defendants' reliance on Mr. Kleinknecht's alleged promises, which contradict the Flip Letter provided prior to execution of the Franchise Agreement, would still be unreasonable.

Defendants remaining arguments are equally unavailing. They next point to the Facility's "poor reputation and troubled history" as evidence that Durga would not have engaged in this venture absent the promise of a better Wyndham flag.[8] DFOF at 8; Trial Tr. at 304:16-24.

---

negotiated by Durga. *See, e.g.*, Trial Tr. at 114:2-5 (Ms. Mallet testifying that "this particular franchise agreement was negotiated" to reflect a lower liquidated damages formula), 188:1-3 ("Q. Did Durga negotiate a reduced royalty and system assessment fee? A. Yes, they did."); *Honeysuckle Enterprises, Inc.*, 2005 WL 3164205, at *8.

[7] When questioned at trial about the handwritten date, Ms. Mallet testified that the date was likely added to reflect the effective date of the Franchise Agreement. Trial Tr. at 118:22-24, 119:25-120:5. The effective date of the Franchise Agreement was backdated to October 23, 2013, when Durga took ownership of the Facility. Trial Tr. at 102:10-11.

[8] Testimony elicited at trial confirmed that Kumar was aware of the Facility's reputation, physical state, and criminal history prior to Durga's purchase of the Facility. *See, e.g.*, Trial Tr. at 242:3-10 (Mr. Syed testifying that "when [Kumar] was buying the hotel," he told Kumar "you have to [ ] put a lot of money on it to refurbish it"), 355:1-4 (Kumar testifying that he was told about the Facility's criminal history "during

However, Kumar testified at trial that he purchased the Facility because he believed he "got a pretty good deal," having paid $800,000 where his predecessor paid $2,500,000. Trial Tr. at 290:7-20, 355:8-10. Further, as noted above, Kumar understood that any promise of a greater Wyndham flag was still predicated on certain improvements being made to the Facility. *See, e.g.*, Trial Tr. at 304:19-20 (Kumar testifying that, even with the understanding that he would receive a greater Wyndham flag, he would need to invest between $700,000 and $800,000 for the hotel to be profitable), 355:8-366:6 (Kumar testifying to his understanding that "if [he] put some money into the hotel it would make money"), 297:4-8 (Kumar testifying he bought the property because Wyndham employees expressed that if he "put the money in," the hotel "will be worth a lot of money in the future"). Durga received the PIP in October 2013 indicating which improvements were required just for the Facility to comply with Travelodge's standards. Trial Tr. at 98:11-99:6 ("Q. What's the purpose of a punch list? A. The punch list describes what a site would have to do to be in compliance . . . with the Travelodge brand's standards."). Yet, at the time Durga terminated the Franchise Agreement in September 2014, those improvements had not been completed. Trial Tr. at 356:18-357:15; *see also* Def. Br. at 4 ("The deal that was struck in October of 2013, so the Defendants thought, was that within one year *all the renovations were done, as per the PIP* . . . at which time the Days Inn Flag would be provided." (emphasis added)). Thus, Durga cannot rely on the Facility's condition when it failed to make improvements that were a precondition to the alleged false assurances.

In addition, Defendants assert that Mr. Kleinknecht's promise of a better flag and Durga's reliance thereon are evidenced by a November 7, 2013, email wherein a Wyndham representative

---

the time of the purchase"); 356:7-12 (Kumar testifying that, "at the time [he] purchased the facility [he] w[as] aware [ ] that the structural condition of the hotel was in poor shape" and that he "even had an engineer look at the hotel").

requested that Durga provide a $35,000 "initial franchise fee." Tr. Ex. 18. Defendants contend that this was the franchise fee for a better Wyndham flag, since the Travelodge Franchise Agreement only called for a $16,000 initial fee. Tr. Ex. 1 at § 6; Def. Br. at 9-10. The only evidence provided for this assertion is Kumar's own testimony. Trial Tr. at 310:17-312:3. However, Kumar also admitted that he never actually paid that sum; upon execution of its agreement with Plaintiff, Durga only paid the $16,000 fee consistent with Section 6 of the Franchise Agreement. Trial Tr. at 351:10-21 (Kumar testifying that Durga paid a $1,000 application fee and $15,000 franchise fee); Tr. Exs. 6, 14. Indeed, Kumar testified that he refused to pay $35,000 at the time because Durga was only contracting for the Travelodge brand. Trial Tr. at 363:1-12 (Kumar testifying that he "didn't owe the 35,000" and he would "agree to pay it . . . [w]hen they give me the brand that they are going to give, . . . and not Travelodge"). Accordingly, the alleged $35,000 franchise fee, which was never paid, cannot serve as Durga's basis for reasonable reliance.[9] Therefore, because Defendants did not establish reasonable reliance, they also fail to prove resulting damages.

### ii. Plaintiff's Performance Under the Franchise Agreement

Defendants next argue that their termination of the Franchise Agreement, and subsequent financial obligations under the Guaranty, are excused by Plaintiff's initial breach. Pl. Br. at 14-21. Specifically, they contend that Plaintiff materially breached the Franchise Agreement by (i) failing to provide Durga access to its reservation system prior to January 2014; and (ii) failing to provide technology support for Plaintiff's operating systems. Under New Jersey law, "a material

---

[9] The parties also dispute whether, under the circumstances, Defendants' fraudulent inducement claim is barred by the economic loss doctrine. Pl. Br. at 14-15; App. Br. at 11-14. Because the Court finds that Defendants have otherwise failed to establish the elements of a fraudulent inducement defense, it need not address this issue.

breach of a contract by one party can excuse performance by the other party." *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 132 (D.N.J. 2012); *see also Weisman v. New Jersey Dep't of Hum. Servs.*, 982 F. Supp. 2d 386, 391 (D.N.J. 2013) ("A material breach to a bilateral contract excuses the other party from performing its future obligations under that contract."). To determine whether a breach was material, "court[s] should evaluate the ratio quantitatively which the breach bears to the contract as a whole, and secondly the degree of probability or improbability that such a breach will be repeated." *Weisman*, 982 F. Supp. 2d at 391 (quoting *Magnet Res., Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 981 (N.J. App. Div. 1998)); *see also Twin Crest Grp.*, 2013 WL 6508242, at *8 ("[A] material breach may arise upon a single occurrence or consistent recurrences which tend to defeat the purpose of the contract." (internal citation omitted)).

Here, Defendants have failed to establish that any such material breach by Plaintiff occurred. Defendants primarily rely on a single email, dated May 28, 2014, in which Mr. Syed indicated to a Travelodge employee that Durga "did not get [their] reservation open until Jan. 2014." Tr. Ex. 22 at Durga000007; *see also* Trial Tr. at 252:2-18 (Mr. Syed refreshing his recollection with the May 28 email and testifying, "I think we took over October 2013, and until January 2014, reservation was not there").[10] However, prior to reviewing the May 28 email, Mr. Syed initially testified that the reservation system "was working for a while" at the time Durga started operating the Facility. Trial Tr. at 250:14-17. In fact, he later explicitly confirmed that Durga was making reservations through Plaintiff's system between November 2013 and January 2014. Trial Tr. at 276:24-277:2 ("THE COURT: Do you know how reservations were made from

---

[10] The Court also notes Plaintiff's argument that, to the extent Mr. Syed testified "reservation was not there" prior to January 2014, it is unclear whether Mr. Syed was speaking to Durga's access to the reservation system or his observation that room bookings were low at that time. Trial Tr. at 252:2-18; Pl. Reply at 7.

November 2013 through January of 2014?  THE WITNESS: It's online or – or by their reservation system.").  And notably, Defendants have offered no evidence of any complaints or inquiries made regarding the reservation system during the time in which it was allegedly inaccessible.  Pl. Br. at 7.  It is also striking that Durga's sole complaint concerning the reservation system arose in the context of Durga disputing the collection of certain fees.  *Id.*  In addition, when Durga paid the fees necessary to execute the Franchise Agreement, Kumar testified with regard to the reservation system that "I heard it came on."  Trial Tr. at 328:1-6.  Ms. Mallet also testified that Durga was provided access to Plaintiff's reservation system upon execution of the franchise agreement.  Trial Tr. at 106:17-107:6 (Q: "Did Travelodge provide Durga with access to its reservation system?" [Ms. Mallet]  A: "Yes."  Q: "When?"  A: "As soon as the franchise agreement was executed." Q: "And that was November 27th, 2013, correct?"  A: "Yes."); *id.* at 107:3-6 (Ms. Mallet testifying, "[w]e were aware [Durga] made reservations through the system as soon as the franchise agreement was executed").

Further, Ms. Mallet testified that Durga was "listed as being active on all th[ird]-party channels as of December 6[, 2013.]"  Trial Tr. at 107:3-6.  Plaintiff's internal reporting records also reflected that the Facility was "Live On All Channels" as of December 6, 2013.  Tr. Ex. 9 at THI000264; Trial Tr. at 154:3-6 (Ms. Mallet testifying, "Salesforce indicates that [Durga] w[as] live on our channels" and was "actively selling on all of our third-party channels" at that time).  Thus, the balance of evidence presented at trial establishes that Durga had access to the reservation system upon execution of the Franchise Agreement on November 27, 2013, and was listed on third-party channels no later than December 6, 2013.

Likewise, Defendants have not established that Plaintiff failed to provide Durga with needed technological support.  As noted above, Defendants provide conflicting evidence that, at

best, suggests certain programs offered by Plaintiff were not operating at some point prior to Durga's termination of the Franchise Agreement. *See, e.g.*, Trial Tr. at 250:14-20 (Mr. Syed testifying that the reservation system would "shut down" from "time to time" or "quite a bit"); Tr. Ex. 22 at Durga000018 (May 9, 2014, email from Mr. Syed stating, "[m]y online reporting is not working since long time and no one is fixing it," to which a Wyndham representative responded providing Mr. Syed contact information for technology support). Again, notably, Defendants have offered no additional evidence corroborating these alleged system failures or documentation of assistance inquiries that went unresolved. To the contrary, documentation was introduced at trial that logged numerous communications between Durga and Plaintiff's technical support unit. Tr. Ex. 9; *see also* Trial Tr. at 108:1-109:22.

In any event, even if it was shown that Plaintiff committed a material breach, Defendants continued to benefit from the Franchise Agreement. It is well-settled that, where one party commits a material breach, "the non-breaching party may not stop performance while continuing to take advantage of the contract's benefits." *Red Roof Franchising, LLC*, 877 F. Supp. 2d at 133-34. As the Third Circuit has previously articulated,

> Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.

*S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (emphasis in original). Here, notwithstanding Plaintiff's alleged breach, Durga continued to operate the Facility as a Travelodge while refusing to pay Recurring Fees contracted for in the Franchise Agreement. *See* Pl. Br. at 17; Trial Tr. at 111:5-11 (Ms. Mallet testifying that Durga stopped operating the Facility as a

Travelodge in September 2014);[11] Tr. Ex. 20 (Durga's September 30, 2014, notice of termination); Trial Tr. at 194:21-195:17 (Mr. Spence testifying that, for the entire duration of the Franchise Agreement, Durga made just one Recurring Fees payment in May 2014 despite earning a profit). Accordingly, Defendants cannot rely on Plaintiff's purported breach to justify their own failure to perform under the Franchise Agreement. *See, e.g.*, *Red Roof Franchising, LLC*, 877 F. Supp. 2d at 133-34 (finding that "any alleged breaches by [plaintiff] did not excuse defendants from performance" where "defendants stopped paying fees but continued to operate the franchise as a Red Roof Inn").[12]

Accordingly, for the reasons set forth above, the Court finds that Durga's unilateral termination of the Franchise Agreement constitutes a breach of contract.

### b. Liability under the Guaranty

Judgment on a guaranty is appropriate where the following is demonstrated: (i) the defendant's execution of the guaranty; (ii) the principal obligation and terms of the guaranty; (iii)

---

[11] Indeed, Kumar testified that Durga's eventual termination of the Franchise Agreement resulted from the realization that it would not be receiving a superior Wyndham flag, Trial Tr. at 331:9-11, meaning Durga's termination was not a response to Plaintiff's alleged breach. Further, the Court is not persuaded by Defendants' newly raised assertion that Durga terminated the Franchise Agreement on May 1, 2014. *See* Def. Br. at 2; DFOF at 11; *see also* Pl. Reply at 8 & n.1. In their pretrial briefing, Defendants explicitly stated that "[o]n or about September 30, 2014, Durga terminated the Franchise Agreement and ceased operating as a Travelodge Hotel." ECF No. 145 at 1. The Court finds, and Defendants provide, no evidence at trial to show Durga terminated the Franchise Agreement any sooner.

[12] To the extent Defendants now raise a defense under the doctrine of unclean hands, which was not contemplated in the Final Pretrial Order, that defense is waived. *See* Pl. Br. at 20-21; FPTO at 15-16; *In re AT&T Sec. Litig.*, No. 00-cv-5364, 2004 WL 6392120 at *5 (D.N.J. Apr. 7, 2004) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint." (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1216 (10th Cir. 2002)); *DiNenno v. Lucky Fin Water Sports, LLC*, 837 F. Supp. 2d 419, 424 (D.N.J. 2011) (finding plaintiff waived negligent entrustment claim that was omitted from the final pretrial order). Regardless, for the same reasons discussed above, the Court is not persuaded that Defendants have evidenced conduct by Plaintiff that is fraudulent, deceitful, unconscionable, or in bad faith. *See Newborn Bros. Co. v. Albion Eng'g Co.*, No. 12-cv-2999, 2023 WL 3645716, at *3 (D.N.J. May 24, 2023); *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 401 F. Supp. 2d 383, 392 (D.N.J. 2005).

the lender's reliance on the guaranty in extending monies to the borrower; (iv) default by the principal obligator; (v) written demand for payment under the guaranty; and (vi) the guarantor's failure to pay upon written demand. *Days Inns Worldwide, Inc. v. Hartex Ventures, Inc.*, No. 10-cv-336, 2012 WL 13034017, at *2 (D.N.J. Aug. 1, 2012) (quoting *U.S. on Behalf of Small Business Admin. v. DelGuercio*, 818 F. Supp. 725, 727-28 (D.N.J. 1993)).

Notably, beyond the question of whether the Franchise Agreement was breached, the parties generally do not dispute their current obligations under the Guaranty. First, there is no dispute that Defendant Vemulapalli authorized Kumar to execute the Guaranty on her behalf. Tr. Ex. 2; FPTO at 4. Second, the Guaranty provided that, upon a default under the Franchise Agreement, the guarantor would "immediately make each payment and perform or cause [Durga] to perform, each unpaid or unperformed obligation of [Durga] under the [Franchise] Agreement." Tr. Ex. 2; FPTO at 4. Defendants do not challenge the Guaranty's provisions nor have they provided evidence that Defendant Vemulapalli or Kumar failed to understand them. *See* Pl. Br. at 18. Third, by its express terms, the Guaranty served as Plaintiff's inducement to execute the Franchise Agreement with Durga. Tr. Ex. 2; Pl. Br. at 19. Fourth, as the Court found above, Durga's unilateral termination of the Franchise Agreement constituted a breach of contract. Fifth, Plaintiff introduced sufficient evidence at trial to show that it provided Defendants written notice of their obligations to pay under the Guaranty following Durga's default. *See, e.g.*, FPTO at 4 (stipulating that Plaintiff "sent a letter dated November 4, 2014, alleging Durga's unilateral termination of the Franchise Agreement . . . and advised Durga that it was required to pay to [Plaintiff], as liquidated damages, in the amount of $129,000.00 and payment of all outstanding Recurring Fees through the date listed on the letter."); Tr. Ex. 4 (Plaintiff's November 4, 2014,

notice of termination letter); Trial Tr. at 112:11-20.[13]  Sixth, at a minimum, it is undisputed that Defendants have not paid Plaintiff the total owed sum of liquidated damages arising out of the Guaranty and Franchise Agreement.  Accordingly, Plaintiff is entitled to judgment on its claim for breach of the Guaranty and Defendant Vemulapalli shall be personally obligated to Plaintiff in the amounts awarded against Durga.

### c.  Damages Analysis

As a result of Defendants' breach of the Franchise Agreement and Guaranty, Plaintiff contends that it is entitled to (i) the amount of unpaid Recurring Fees, inclusive of interest, defaulted on by Durga, Pl. Br. at 20; (ii) liquidated damages in the amount of $129,000 plus applicable interest, *id.* at 22-23; and (iii) attorneys fees and costs in an amount to be determined by the Court, *id.* at 23-24.  Independent of their substantive challenges to liability under the agreements, Defendants also challenge Plaintiff's calculation of Recurring Fees and liquidated damages.  Def. Br. at 21-24.

### i.    Recurring Fees

Defendants' obligation to pay Recurring Fees arises out of Sections 7, 13.2, 18, and Schedule C of the Franchise Agreement.  *See* Tr. Ex. 1 at §§ 7.1 (noting the requirement to pay monthly Recurring Fees, encompassing royalty fees, system assessment fees, and additional fees), 13.2 (noting fees in the event of termination), 18 (describing combined fees and relevant fee rates);

---

[13] At trial, Plaintiff also introduced notices of monetary default, dated July and November 2014, that were issued to Durga with regard to its failure to pay Recurring Fees.  Tr. Exs. 15-16; Trial Tr. at 92:7-15. Defendants argue these deficiency notices are insufficient because, in violation of the Franchise Agreement, they are dated "several months after Defendants terminated the Agreement" in May 2014.  DFOF at 11. However, as the Court found above, Durga terminated the Franchise Agreement in September 2014. Regardless, Plaintiff also introduced evidence showing that fee collection emails were sent to Durga prior to May 2014.  *See, e.g.*, Tr. Ex. 9 at THI00286-000292 (showing log entries for collection emails sent between January and March 2014); Trial Tr. at 110:19-111:1 (Ms. Mallet testifying that communications were made to Durga prior to July 2014 notifying them of Recurring Fees deficiencies).

Tr. Ex. 1 at Schedule C (providing additional information on system assessment and other fees). Defendants do not dispute the fact that these provisions entitle Plaintiff to Recurring Fees under the Franchise Agreement. At trial, Plaintiff introduced an itemized account statement, dated as of February 1, 2024, detailing Durga's unpaid Recurring Fees along with applicable finance charges (*i.e.*, interest). Tr. Ex. 5; *see also* Trial Tr. at 193:12-15 (Mr. Spence testifying that "interest" and "finance charges" are interchangeable terms).

Defendants' challenges to their fee obligations are without merit. Def. Br. at 21-23. Defendants failed to provide evidence supporting their position that "numerous checks were sent to Wyndham for all the appropriate fees," or that Durga was "up to date on payments" at any point during its operation of the Facility as a Travelodge. Def. Br. at 21. In contrast, Plaintiff provided documentation showing that Defendants made one single payment towards Recurring Fees in May 2014 in the amount of $4,265. Tr. Ex. 6; Trial Tr. at 195:2-11. A different result in not compelled just because Defendants identify a single check for $3,000, dated April 15, 2014, from an unknown entity to Plaintiff. ECF No. 160. Notably, this evidence was introduced for the first time in Defendants' post-trial briefing, without adequate explanation for the delay. *See Masterank Wax, Inc. v. RFC Container, LLC*, No. 19-cv-12245, 2022 WL 19927891, at *8 (D.N.J. Aug. 30, 2022) (stating that, even absent bad faith, "where an oversight is not rationally explained and is surely prejudicial, exclusion is appropriate" (internal citation omitted)). Even if the Court were to consider this post-trial exhibit, other than asserting that the unknown entity belongs to Defendants, no evidence or explanation was provided to establish the circumstances surrounding this alleged payment. For the same reasons, this evidence does not support Defendants' argument that Plaintiff's account records (Tr. Exs. 5-6) are otherwise unreliable. *See* Trial Tr. at 191:6-12,

194:15-20 (Mr. Spence testifying that Plaintiff's itemized statements and cash application reports are kept in the normal course of business).[14]

As to the issue of signage removal, Mr. Spence testified that the March 31, 2016, fee for $8,191.92 reflected costs for Plaintiff's removal of its branded signage from the Facility. Trial Tr. at 192:7-20. Costs for signage removal were allocated to Durga in the Franchise Agreement. *See* Tr. Ex. 1 at § 13.2; Trial Tr. at 115:22-116:3; Tr. Ex. 18 (contractor invoice corroborating the cost of signage removal from the Facility). Thus, this fee is appropriately assigned to Defendants. Likewise, Mr. Spence testified that he would expect to see "charges that occurred just after or around the time of termination that would have been charged a month later." Trial Tr. at 193:3-8. Indeed, there are four logged fees dated in October 2014, the month following Durga's termination of the Franchise Agreement. Tr. Ex. 5 at 3. The Court finds that these fees are also appropriately assigned to Defendants.

Nevertheless, the Court is not persuaded that Plaintiff is entitled to the total sum of Recurring Fees charged to Defendants *following* termination of the Franchise Agreement. *See* Tr. Ex. 5 at 3 (logging additional fees from October 2014 through March 2016). There are six additional charges between November 2014 and October 2015 that Plaintiff has failed to substantiate. *Id.* Collection of post-termination fees would duplicate Plaintiff's recovery of liquidated damages. *See* Tr. Ex. 1 at § 1.1 (articulating that liquidated damages compensate

---

[14] To the extent Defendants also argue they are not responsible for fees arising prior to execution of the Franchise Agreement, DFOF at 11, the Court is not persuaded. Schedule D to the Franchise Agreement required Durga to assume responsibility for outstanding fees of the predecessor franchisee. Tr. Ex. 1 at Schedule D § 1; Trial Tr. at 191:13-192:6. While Defendants argue Schedules C and D should be disregarded because they were not initialed by Defendant Vemulapalli, DFOF at 11-12, the Court notes that both Schedules C and D are explicitly referenced in multiple provisions throughout the Franchise Agreement. *See generally* Tr. Ex. 1. Defendants have provided no evidence that these schedules were surreptitiously later added to the Franchise Agreement or that Defendants inquired about these purportedly missing schedules at the time the agreement was executed. Defendants witnesses also did not speak to this issue at trial.

Plaintiff for "lost future Recurring Fees"). Plaintiff shall not be entitled to recover these six post-termination fees.[15] *See Ramada Worldwide Inc. v. Khan Hotels LLC*, No. 16-cv-2477, 2017 WL 187384, at *7 (D.N.J. Jan. 17, 2017), *amended*, 2017 WL 2831168 (D.N.J. June 30, 2017) (denying Plaintiff post-termination fees where "Ramada submits no explanation as to why it should receive Recurring Fees or other charges amassed over the 17 months *following* termination of the Franchise Agreement"); Tr. Ex. 1 at § 7.1 (noting that the franchisee shall "pay [Plaintiff] certain 'Recurring Fees' each month *of the Term*" (emphasis added)).

Therefore, consistent with the Court's findings, Plaintiff is entitled to the unpaid Recurring Fees contracted for in Sections 7, 13.2, 18, and Schedule C of the Franchise Agreement. *See* Tr. Ex. 1. This amounts to a base sum of $35,027.69 absent prejudgment interest (*i.e.*, $35,906.17 less the sum of those fees found to be unsubstantiated). Section 7.3 of the Franchise Agreement imposes an interest rate of 1.5% per month on the principal amount of Recurring Fees owed. Tr. Ex. 1 at § 7.3. "Prejudgment interest may be determined by contract." *See Honeysuckle Enterprises, Inc.*, 2005 WL 3164205, at *10 (finding plaintiff was "entitled to prejudgment interest at a rate of 1.5% per month" where the license agreement provided for monthly interest at that rate). Accordingly, Plaintiff is entitled to prejudgment interest at the rate of 1.5% per month on the $35,027.69 base sum of Recurring Fees from November 14, 2014 (which is ten days after the date of Plaintiff's November 4, 2014, acknowledgement of Durga's termination effective September 30, 2014) through the date of judgment. Tr. Exs. 4, 1 at § 13.2 (instructing that the franchisee "will pay all amounts owed [ ] under this Agreement within 10 days after termination"); *see also Honeysuckle Enterprises, Inc.*, 2005 WL 3164205, at *10.

---

[15] The six omitted fees include a November 22, 2014, charge for $209.98; a December 10, 2014, charge for $326.00; a December 22, 2014, charge for $12.50; and three October 1, 2015, charges totaling $330.00. Tr. Ex. 5 at 3.

### ii. Liquidated Damages

Under New Jersey law, "[t]he validity of a liquidated damages clause depends upon whether it reasonably forecasts the harm resulting from the breach." *Khan Hotels LLC*, 2017 WL 187384, at *6. Validity of a liquidated damages clause is a question of law for the Court, and its reasonableness can be assessed "either at the time of contract formation or at the time of the breach." *Travelodge Hotels, Inc. v. Seaside Hosp., LLC*, No. 15-cv-5595, 2016 WL 5899281, at *5 (D.N.J. Oct. 6, 2016) (internal citation omitted); *see also Days Inns Worldwide, Inc. v. T.J. LLC*, 2017 WL 935443, at *3 (D.N.J. Mar. 9, 2017). Ultimately, "difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the [question of] validity." *Days Inn Worldwide, Inc. v. BFC Mgmt., Inc.*, 544 F. Supp. 2d 401, 406 (D.N.J. 2008) (quoting *MetLife Capital Fin. Corp. v. Washington Ave. Assocs. L.P.*, 732 A.2d 493 (N.J. 1999)). The party challenging the liquidated damages clause bears the burden of establishing the provision's unreasonableness. *Id.*

Here, the parties' liquidated damages provision is outlined in Sections 12 and 18.1 of the Franchise Agreement. Tr. Ex. 1 at §§ 12, 18.1. The Court starts with the presumption that the parties' negotiated damages clause is valid. *See River Rd. Assocs. v. Chesapeake Display & Packaging Co.*, 104 F. Supp. 2d 418, 422 (D.N.J. 2000) ("In the context of commercial contracts, the New Jersey Supreme Court has stated that stipulated damages clauses are presumptively valid."). The Franchise Agreement articulates that the stipulated damages calculation stands "in place of [Plaintiff's] claims for lost future Recurring Fees." Tr. Ex. 1 at § 12.1. This rationale reasonably ties the stipulated damages to Plaintiff's harm following a breach of contract. *See, e.g.*, *Ramada Franchise Sys., Inc., v. Hanna Hotel Enterprises, LLC*, 147 F. Supp. 2d 840, 848-49 (N.D. Ohio 2001) (applying New Jersey law and finding the same explanation reasonable); *Seaside*

*Hosp., LLC*, 2016 WL 5899281, at *5 (finding to be reasonable stipulated damages representing "lost Recurring Fees as a result of termination").  At trial, Ms. Mallet testified that liquidated damages are governed by a fixed estimation "because it's hard to calculate, at the onset of the agreement, what . . . would happen in the event of [ ] an early termination."  Trial Tr. at 113:22-114:5; *see also Seaside Hosp., LLC*, 2016 WL 5899281, at *5 (considering stipulated damages "meant to replace the income that Travelodge would have received if not for [ ] premature termination" and "accept[ing] that such damages cannot be known with precision, and must be estimated").  The Court agrees that such future damages are not easily calculable at the onset of a fifteen-year term contract.

The Franchise Agreement further dictates that, for any termination occurring prior to the last two years of the Franchise Agreement's term, Durga shall pay liquidated damages in the amount of $1,000 "for each guest room of the Facility [it is] authorized to operate at the time of Termination." Tr. Ex. 1 at § 18.1.  Courts applying New Jersey law have found identical liquidated damages provisions reasonable in similar contexts.  *See, e.g.*, *T.J. LLC*, 2017 WL 935443, at *3 (awarding liquidated damages where parties contracted for a calculation of $1,000 per guest room before interest); *Travelodge Hotels, Inc. v. Wilcox Hotel, LLC*, No. 17-cv-0391, 2018 WL 1919955, at *4 (D.N.J. Apr. 23, 2018) (awarding liquidated damages contracted at a rate of $1,000 per guest room for an 80-room facility).  In fact, testimony was elicited at trial establishing that Durga negotiated with Plaintiff for a damages calculation below the $2,000-per-room rate Plaintiff typically employs.  *See* Trial Tr. at 113:20-114:13.  Courts have even found this higher calculation to be reasonable.  *See, e.g.*, *Days Inns Worldwide, Inc. v. Yug Hosp., LLC*, No. 19-cv-17191, 2020 WL 7383190, at *3 (D.N.J. Dec. 14, 2020) (awarding $129,364.69 in liquidated damages, derived from a contracted rate of $2,000 per guest room plus interest); *Travelodge Hotels, Inc. v. Surajhira,*

*LLC*, No. 18-cv-10510, 2019 WL 981699, at *3 (D.N.J. Feb. 28, 2019) (awarding liquidated damages at a contracted rate of $2,000 per guest room plus interest); *Hanna Hotel Enterprises, LLC*, 147 F. Supp. 2d at 848-49 (applying New Jersey law and collecting cases finding similar liquidated damages calculations were reasonable).

Upon execution of the Franchise Agreement, Durga contracted to operate the Facility as a Travelodge with a 129-room capacity. *See* Tr. Ex. 1 at Schedule B (identifying the "[n]umber of approved guest rooms" at the Facility to total 129 and containing Defendant Vemulapalli's handwritten initials); Trial Tr. at 157:17-158:3. The Court is not persuaded by Defendants' argument that liquidated damages should be capped at the number of rooms that were physically rentable at the time of termination. Def. Br. at 23-24. While Defendants argue that only a percentage of the 129 rooms were guest-ready prior to termination, they have offered no evidence clearly establishing how many rooms were inoperable. *See, e.g.*, Trial Tr. at 304:6-15 (Kumar testifying that "maybe 30" rooms were rentable upon his inspection of the Facility); Trial Tr. at 269:7-9 (Mr. Syed testifying that "20 percent" of the rooms were rentable in September 2014); Def. Br. at 23 (stating that "maybe twenty rooms" were rentable at the time of termination). More importantly, Defendants, who bear the burden of discrediting the liquidated damages provision they negotiated, provide no support for their interpretation that the phrase "authorized to operate" in Section 18.1 is limited to those rooms Durga deemed rentable. Nor do Defendants counter Ms. Mallet's testimony that the number of rooms reflected in Schedule B was determined during an inspection of the Facility prior to execution of the Franchise Agreement. *See* Trial Tr. at 162:14-163:8. In fact, Kumar testified at trial that he signed an application listing the "total number of rentable guest rooms" as 129. *See* Tr. Ex. 14 at THI000848; Trial Tr. at 344:19-346:14.

Accordingly, Plaintiff is entitled to liquidated damages in the amount of $129,000, representing a rate of $1,000 per guest room at the Facility. Plaintiff is also entitled to prejudgment interest on the principal amount of liquidated damages at a rate of 1.5% per month from December 4, 2014 (which is thirty days after the date of Plaintiff's November 4, 2014, acknowledgement of Durga's termination effective September 30, 2014) through the date of judgment. *See* Tr. Ex. 1 at §§ 7.1, 12.1 (requiring payment of liquidated damages "within 30 days following the date of Termination"); *see also Honeysuckle Enterprises, Inc.*, 2005 WL 3164205, at *10.

### iii. Attorneys Fees and Costs

Section 17.4 of the Franchise Agreement entitles Plaintiff to attorneys fees and costs "incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement." Tr. Ex. 1 at § 17.4; FPTO at 4. Recovery of such costs and fees is permissible under New Jersey contract law. *See Travelodge Hotels, Inc. v. Meridian Glob. Invs., LP*, No. 11-cv-2599, 2012 WL 2341466, at *7 (D.N.J. June 15, 2012) ("Attorneys' fees clauses are enforceable under New Jersey law."); *Honeysuckle Enterprises, Inc.*, 2005 WL 3164205, at *10. Plaintiff shall submit a separate application for these fees and costs at which time Plaintiff can establish their amounts.

### VI.    <u>CONCLUSION</u>

For the reasons set forth above, judgment will be entered in favor of Plaintiff against Defendants on Plaintiff's complaint. A separate Judgment will accompany this Opinion.

Date: September 30, 2024

_/s/ Claire C. Cecchi_
_____
**CLAIRE C. CECCHI, U.S.D.J.**